HARRY S. COWEN and Another, Respondents, v.
REGINALD W. PRESSPRICH et al., Appellants.

(Supreme Court, Appellate Term, First Department, February,
1921, Term — Filed January, 1922.)

Bailment — conversion — involuntary bailee exercising dominion
over article bailed — stockbrokers liable for delivery to wrong
person of bond sent by mistake.

An involuntary bailee, so long as the lack of volition con-
tinues, is not in duty bound to care for or guard the subject
of the bailment and cannot be held, in respect to custody, for
what would even be the grossest negligence in the case of a
voluntary bailment.

Where, however, an involuntary bailee does exercise any
dominion over the thing so bailed, he becomes as responsible
as if he were a voluntary bailee and is absolutely liable in
conversion for delivery of the subject of the bailment to the
wrong person.

Plaintiffs, a firm of stock exchange brokers, in order to fill
an order for the sale and delivery of a fully negotiable bond
of a certain railroad company to the defendants who are en-
gaged in the same line of business, ordered the bond from a
third bond house which by mistake sent to plaintiffs a bond of
another railroad company, which the plaintiffs also by mis-
take sent to the defendants in the following manner:  Said
bond and a slip briefly describing a bond of the first railroad
company were enclosed in an envelope and taken to defend-
ants' place of business by one of the messenger boys in the
employ of plaintiffs, who dropped the envelope into a slot
above a closed window of opaque glass, where deliveries were
wont to be made and left.  Immediately after a member of
defendants' firm opened the window and an unidentified boy,
not plaintiffs' messenger, stepped up and in answer to the
direction to make the statement on the slip agree with the
bond, said:  "All right," took the bond and left.  Upon
affirming a judgment in favor of plaintiffs for the conversion
of the bond, *held*, that defendants upon the delivery of the
bond to them became involuntary bailees thereof and when

they undertook to re-deliver the same, they acted as greatly at their peril as if they had been voluntary bailees.

Defendants could have protected themselves by telephoning to the plaintiffs that the wrong bond had been delivered or they could have sent the bond back to plaintiffs by one of their own messengers.

*Krumsky* v. *Loeser,* 37 Misc. Rep. 504, distinguished.

Where an action is tried as one for conversion a judgment in favor of plaintiff can be sustained, if at all, only upon that theory.

Burr, J., concurring in result, Lehman, J., dissenting.

APPEAL by defendants from a judgment of the Municipal Court of the city of New York, borough of Manhattan, first district, in favor of plaintiffs, after trial by the court without a jury.

Winthrop & Stimson (Frederick W. Steele, of counsel), for appellants.

Louis F. Doyle (Warren Bigelow, of counsel), for respondents.

MULLAN, J. Conversion, for the defendants' alleged wrongful delivery of a bond. The parties on both sides are stock-exchange brokers. Plaintiffs had agreed to sell and deliver to defendants a bond of the Oregon Short Line Railroad, of the par value of $1,000. To fill that order plaintiffs ordered the bond from a third bond house and the latter, by mistake, sent plaintiffs an Oregon and California Railroad bond, and plaintiffs, also by mistake, sent this Oregon and California bond to defendants. There is no controversy as to the manner of the sending. Plaintiffs handed the Oregon and California bond to Goldberg, a youth of seventeen years, who was one of plaintiffs' two messengers, or " runners " as they seem to be

called. With the bond was a memorandum (also called " slip " or " statement ") briefly describing an Oregon Short Line bond. The bond and slip were inclosed together in an envelope. Goldberg took the envelope to defendants' place of business in a Wall street office building. Defendants' suite of offices had two entrance doors from the office-building hall, one for general use, and the other for persons, such as Goldberg, making deliveries. Goldberg entered at the latter door, and was then in a tiny outside room, described as about two feet by six feet. There was no door for passage between this small outside room and an inside, and presumably larger, room. Deliveries were made by dropping papers in a slot in one of the partitions partly forming this small outer room. Above the slot was a window, of opaque glass, that swung inwards. That window was kept closed unless or until the person acting for defendants at the delivery window should desire to talk to one making a delivery, when he would open the window. Next to the partition containing that slot and window, and in the inner room, was a desk at which was kept seated either a member of defendants' firm or a clerk. At the time here in question there were two persons at that desk, Mr. Quackenbush, of the defendants' firm, and an employee, one Campbell. Goldberg dropped the envelope through the slot. His testimony was: " I waited until he (the person at the desk) took it in and then I left. * * * I told him I will call back for a check. Q. Why didn't you ask for the receipt? A. Well, I was in a hurry, I had many deliveries that day, and I had to make them. * * * Q. How long would you say you were in that delivery room in front of that delivery window — from the time you put the bond in until you left? A. It was from a minute to a minute and a half." Goldberg could not recall whether the person

Appellate Term, First Department, January, 1922. [Vol. 117.]

at the other side of the window said anything. He thought, but was not sure, that there was " somebody " else in the little outside room when he was there. It does not appear, from Goldberg's testimony, whether or not the delivery window was open during any part of his stay while making the delivery. Mr. Quackenbush testified as follows: " Q. Will you tell us what took place at the time of that delivery? A. It was about ten-thirty in the morning; Mr. Campbell and myself stood there making up our loans, when a bond shoots through the window like a streak of lightning; it goes right down my desk — that was my desk about the width of this table (indicating stenographer's table) — right down in front of us. As it rolls over, I opened it up, just pulled the bond open that way instantly. [Indicating.] The statement called for an Oregon Short Line five bond; I could see immediately that the bond was an Oregon and California, and we handle thousands of them. Q. What did you do then? A. I immediately opened the window. Q. Where was that, right in front of you? A. Right like that [indicating] and I yelled ' Cowen.' A young man steps right up and I says make your statement agree with the bond. The Court: Sir? The witness: Make your statement agree with the bond. He mumbled, ' all right,' and takes the bond and goes out immediately like that. Q. And he took it? A. He took it. Q. When you say man —? A. A young boy nineteen or twenty years old. Q. What did you do then, close the window? A. Closed the window, went about my work. Q. You were expecting from Cowen and Company at that time a Short Line bond, were you not? A. Yes. We had purchased one, looking for it. Q. You were looking for it? A. Yes, some day. Q. And you say you instantly found it was not —? A. It was not more than fifteen seconds. Q. And you

were under no contract to purchase from Cowen and Company a California bond? A. No sir. Q. How long would you say it took between the time that bond came into your slot on to your desk and the time you opened the window and yelled Cowen? A. Not a second more than fifteen. Q. Fifteen seconds? A. Not a second more than that. Q. When you opened the window where did the boy come? A. To my left from the main door. Q. You heard the Goldberg boy testify, did you not, that when he put that bond into your window, he waited about a minute and a half, is that correct? A. I will say no. Q. Did you hear him say anything? A. Nothing. Q. The only thing you know is seeing the bond shoot into the window. A. Exactly. Q. Was there a receipt on that bond to be signed by you? A. No sir, it was not. Q. It was merely a sale memorandum? A. Exactly. Q. Neither one of them is the young man to whom you delivered the bond? A. No sir. Q. You delivered the bond to some one else? A. Neither one of those (plaintiffs) boys.'' Mr. Campbell substantially corroborated Mr. Quackenbush's version.

Concededly, the boy to whom Quackenbush returned the bond delivered by Goldberg was not Goldberg, but some unidentified boy who made away with the bond. The bond was of the bearer type, fully negotiable.

The defendants have refused to make good the plaintiffs' loss, contending that they were chargeable only with due diligence, and that, accepting the version of the plaintiffs as given by Goldberg, it appears that they exercised all the care required of them. The plaintiffs contend that there was an absolute obligation on the part of the defendants to redeliver the bond to the plaintiffs, and that no question of negligence enters into the case. They also argue that if the negligence question does enter, there was sufficient evidence

Appellate Term, First Department, January, 1922. [Vol. 117.

to warrant a finding that the defendants did not, in fact, exercise due care. The learned trial judge did not state the ground of his decision in plaintiffs' favor.

A person who has been put, through no act or fault of his own, in such a situation as that in which the defendants were put upon the delivery to them of the wrong bond, has come to be known as "involuntary bailee" (1 Halsbury Laws of Eng. 528; *Heugh* v. *L. & N. W. R. R. Co.,* L. R. 5 Ex. 51 (1870); 5 Cyc. 166, n. 27; Story Bailm. [7th ed.] §§ 44a, 83a), or bailee by casualty (*T. J. Moss Tie Co.* v. *Kreilich,* 80 Mo. App. 304) or constructive or *quasi* bailee (Schouler Bailm. [3d ed.] ¶ 3).

In the field of voluntary bailments, whether they be for hire or be otherwise coupled with an interest on the part of the bailee, or whether they be merely gratuitous, no rule is better settled than that it is the duty of the bailee to deliver the bailed article to the right person, and that delivery to the wrong person is not capable of being excused by any possible showing of care or good faith or innocence. *Willard* v. *Bridge,* 4 Barb. 361; *Hawkins* v. *Hoffman,* 6 Hill, 586; *Esmay* v. *Fanning,* 9 Barb. 176; *Packard* v. *Getman,* 4 Wend. 613; *Carroll* v. *Mix,* 51 Barb. 212; *Coykendall* v. *Eaton,* 55 id. 188; *McEntee* v. *N. J. Steamboat Co.,* 45 N. Y. 34; *Price* v. *Oswego & Syracuse Ry. Co.,* 50 id. 213; *Bank of Oswego* v. *Doyle,* 91 id. 32; *Ouderkirk* v. *Central National Bank of Troy,* 119 id. 263; *Sonn* v. *Smith,* 57 App. Div. 372; *McKillop* v. *Reich,* 76 id. 334; *Cohen* v. *Koster,* 133 id. 570; *Hassan* v. *Platt,* 163 id. 366; *Stewart* v. *Frazier,* 5 Ala. 114; *Lichtenhein* v. *Boston & Providence Railroad Co.,* 11 Cush. 70; *Hall* v. *Boston & Worcester Railroad Co.,* 14 Allen, 439; *Jenkins* v. *Bacon,* 111 Mass. 373; *Jones* v. *Dowle,* 9 M. & W. 19; 6 C. J. 1143; 27 Eng. R. Cas. 252, 253; 1 Halsbury Laws of Eng. 527.

Such distinctions as have been drawn between the duties of voluntary bailees for compensation, and voluntary gratuitous bailees, relate solely to the degree of care the bailee should exercise in respect of the *custody* of the thing bailed. In respect of *delivery* to the proper person, no such distinction is drawn; the duty in both cases is absolute.

What, then, is the difference, if any, between the duty of a voluntary gratuitous bailee, and that of a wholly involuntary bailee? There is an astonishing paucity of decision and text opinion upon the subject. I think, however, that all that can be found upon it points to the conclusion that the involuntary bailee, as long as his lack of volition continues, is not under the slightest duty to care for or guard the subject of the bailment, and cannot be held, in respect of custody, for what would even be the grossest negligence in the case of a voluntary bailment (1 Halsbury Laws of Eng. 527, 528; *Howard* v. *Ellis,* 1 Cab. & El. 253; *Smith* v. *Nashua & Lowell Railroad Co.,* 27 N. H. 86); but that in case the involuntary bailee shall exercise any dominion over the thing so bailed, he becomes as responsible as if he were a voluntary bailee. 1 Halsbury, 528, ¶ 1078; Story Bailm. (7th ed.) §§ 85–88; *Smith* v. *N. & L. R. R. Co., supra; T. J. Moss Tie Co.* v. *Kreilich,* 80 Mo. App. 304; *Hiort* v. *Bott,* L. R. 9 Ex. 86.

In *Hiort* v. *Bott, supra,* the plaintiff shipped barley to defendant, at the same time sending to defendant an invoice stating that the barley was ordered by defendant through G., described in the invoice as a broker acting for both parties, and with the invoice was a " delivery order " that made the barley deliverable to the order of " consignor or consignee." The defendant had not ordered the barley, and had never had any dealings with either the plaintiff or G. A few

Appellate Term, First Department, January, 1922. [Vol. 117.

days later G. called upon defendant, informed defendant that the shipment to him was made by mistake, and asked defendant to indorse the delivery order to him, G. The defendant complied, and G., concededly an impostor, obtained the barley and absconded. It was held that as the defendant by reason of his affirmative act exercised dominion over the barley, thus causing a misdelivery, he was liable in conversion as matter of law. The defendant there relied largely upon an earlier case in the Exchequer, *Heugh* v. *L. & N. W. R. R. Co.,* L. R. 5 Ex. 51 (1870). In the *Heugh* case the plaintiff shipped goods upon the supposed order of a concern that had in fact gone out of business, the order having been forged by one Nurse, a former employee of the consignee. The defendant carrier tendered the goods at the stated address of the consignee, and acceptance was refused by the persons who had succeeded to the possession of the premises. The carrier then mailed an "advice note" to the consignee, at the same address, asking for instructions. Nurse shortly thereafter called upon the carrier, with the advice note, and the carrier turned the goods over to him. It was held that the defendant carrier, described by Kelly, C. B., as an "involuntary bailee," was not under an absolute duty to deliver to the proper person, but that it was properly a question for the jury whether the carrier had "exercised reasonable and proper care." One of the barons, Channell, said that "some American cases" were cited in support of the proposition that the delivery to Nurse amounted in law to a conversion, but that they failed to satisfy him that any greater duty was cast upon the carrier than to exercise reasonable care. It may be said, in passing, that the decision in the *Heugh* case is directly opposed to the doctrine of the American cases. In *Price* v.

*Oswego & Syracuse R. R. Co.,* 50 N. Y. 213, 221, the doctrine of the *Heugh* case was expressly disapproved, and in *Jenkins* v. *Bacon,* 111 Mass. 373, it was said that " if the case of *Heugh* v. *London & North Western Railway· Co.,* L. R. 5 Ex. 51, can be said to present a case of delivery to the wrong person, (which is open to considerable doubt,) the doctrine there asserted is directly opposed to the above-cited decisions of this court."

The distinction sought to be made by the judges in the *Hiort* case to escape the holding in the *Heugh* case is so far from clear to me that I shall not attempt to state it.

In *T. J. Moss Tie Co.* v. *Kreilich,* 80 Mo. App. 304, the organizers of a railroad company, which never became an accomplished fact, purchased a right of way with reversion to the grantor in case the road was not constructed. Prior to the abandonment of the project, railway ties were placed upon the land so purchased. After abandonment, the reversioner refused to give the ties up. It was held that he was held to an absolute liability to give them up to the true owner, and that the only question in the case was as to who that owner was.

In *Krumsky* v. *Loeser,* 37 Misc. Rep. 504, the facts, as stated by Mr. Justice Greenbaum in his opinion, were as follows: " The plaintiff is a manufacturer of ladies' wrappers. The defendants are the proprietors of a large department store in Brooklyn. The parties had never had business relations with each other. On April 19, 1901, two swindlers purporting to represent the defendants ordered a bill of goods of the plaintiff, with directions to deliver them to the defendants' place of business. The plaintiff, after satisfying himself of the financial ability of defendants, as he asserts, sent the goods

Appellate·Term, First Department, January, 1922.   [Vol. 117.

to the defendants by an expressman. It appears that the defendants' establishment is in the habit of receiving about 350 packages from various houses daily and that the goods were received under the assumption that they had been ordered by the defendants. Later in the day the man in charge of the receiving department of the defendants was called upon the telephone by a person who represented himself to be the plaintiff and who stated that the case of wrappers had been delivered to the defendants by mistake and that the goods would be called for. Shortly after this conversation a person called with an order, purporting to be signed by plaintiff, addressed to the defendants, requesting the redelivery of the case to bearer. The order explained that the mistake was occasioned by wrongly addressing the goods to the defendants instead of ' E. Losier, Savannah, Ga.,' and expressed the hope that the defendants had not been inconvenienced. The goods were thereupon handed over to the bearer of the order. It subsequently transpired that the plaintiff and the defendants were the victims of a swindle and the question is presented as to which of the parties must bear the loss of the goods.'' The opinion then proceeds: '' The plaintiff attempts to fasten a liability upon the defendants as gratuitous bailees upon the theory of the defendants' negligence in accepting the goods and delivering them up to a stranger. Were defendants bailees? A bailment must be predicated upon some contractual relations, express or implied, upon the delivery of the goods, between the bailor and bailee. In this case the goods were by trick, the result of a fraud practiced upon plaintiff, thrust upon the defendants, who thus for a short time were, unconsciously and unknowingly, the custodians of the plaintiff's goods. Where one becomes possessed of another's goods by chance or

accident, no bailment obligation will arise unless the possessor is aware and has knowledge of the fact that goods have come into his possession which belong to another. In the case at bar, the knowledge that the defendants became possessed of the goods not belonging to them was communicated to them by the swindler to enable him to carry out his scheme of obtaining the property of the plaintiff. If I am apprised by another that a certain article belonging to him has been sent to me by mistake, am I not justified in assuming, from the very fact of such party first making me aware of its possession, that he is the true owner and entitled to its return? Am I obligated or beholden to the real owner, if I have been deceived, to account for the value of the article thus secured from me through trick? I think not. If, however, by any process of reasoning, the duty of a gratuitous bailee could be fastened upon the defendants, then I am of the opinion that, inasmuch as they would only be chargeable in that case with gross negligence (*First National Bank* v. *Ocean National Bank*, 60 N. Y. 278), they should not be here held liable. They were certainly no more negligent than was the plaintiff in parting with his goods. The defendants, indeed, acted in the matter as any ordinarily prudent man could have been expected to act under the circumstances.''

I am of the opinion that the *Krumsky* case is clearly distinguishable from that at bar. As I read the opinion there, the holding of the court was predicated upon two considerations, neither of which touches the instant case, namely, that the possession of the defendants there was due to a trick and a fraud and defendants' total lack of knowledge of the true owner. As to the effect of fraud, there is support to be found for the *Krumsky* decision in *Metzger* v. *Franklin Bank*, 119 Ind. 359 (and see Schouler Bailm. [3d

**43**

ed.] 72), but there was analogous fraud in the *Hiort* case, and in *Duff* v. *Budd,* 3 Brod. & B. 177, and in *Price* v. *Oswego & Syracuse R. R. Co.,* 50 N. Y. 213, and numerous other of the cases I have cited, and not only do the decisions in those cases, holding the defendants to an absolute liability, negative the materiality of the fraud consideration, but in the *Price* case that very point is discussed and rejected.

As to the effect of the total lack of knowledge on the part of the bailee concerning the identity of the bailor, the decision in the *Krumsky* case does, however, find strong support in the case of *Morris* v. *Third Ave. R. R. Co.,* 1 Daly, 202. There a satchel was found in a street car by the conductor. No one knew how it got there. Presumably, it was unintentionally left behind by some passenger. The conductor brought it, at the end of his run, to the railroad office. A few minutes later an impostor called for the satchel and, upon testimony which the trial and appellate courts held warranted a finding that there was an inadequate description by the impostor of the contents of the satchel, the railroad officials delivered the satchel to the impostor. The ruling was that the defendant's duty was merely to exercise reasonable care. I think it is possible to agree that the case was correctly decided, without admitting that the decision touches the instant case, or that it was rested upon entirely correct principles. The court there described the defendant carrier as a bailee for hire at the time of its delivery over of the satchel. Had that been so, clearly the duty of the defendant to deliver to the right person was absolute. But, although the court fell into that undoubted error, I am inclined to think it reached the right conclusion, and upon the proper ground, viz., that because the defendant carrier did not have any reason to know who the true

Misc.]    Appellate Term, First Department, January, 1922.

owner was, nothing more could have been required of it than to exercise due care to see to it that the satchel should come into the hands of the true owner.

I have reached the conclusion that while, at first blush, it may seem to be imposing upon the defendants an unduly severe rule of conduct to hold them to an absolute liability, the rule is no more severe than the occasion calls for. The exchequer judges in the *Hiort* case were reluctant to hold the defendant there to the rule of absolute liability, but they were, nevertheless, unanimous in doing so; and I think the rule worked more harshly there than it would here. There, the parties never had any relations with each other. Here, the plaintiffs were at least attempting to fill an order given by the defendants. The defendants could easily have protected themselves by telephoning the plaintiffs that the wrong bond had been delivered, or they could have sent the bond back to the plaintiffs by one of their own messengers. Instead, they chose to take the chance of delivering it to the wrong messenger. As the delivery window was closed when the bond was dropped through the slot, and remained closed for an appreciable time, they could not have known what messenger had made the delivery.

As was said by one of the judges in the *Hiort* case, many ingenious supposititious cases might be suggested involving erroneous deliveries of parcels at one's home or business place, but, as was there observed, " probably the safest way of dealing with (any such case) is to wait until it arises."

The plaintiffs, as has already been mentioned, urge that if the defendants are not to be held in conversion they are, at least, liable in negligence. The action, however, was brought in conversion, and both sides insist that it was tried as a conversion action. The judgment, therefore, may only be sustained, if at all, upon that theory.

Since writing the foregoing, I have had the benefit of the opinion of Mr. Justice Lehman, in which, with characteristically cogent reasoning, my learned brother supports the view that there was no such exercise of dominion on defendants' part as to make applicable the rule of absolute obligation. I am not at all sure that, if the matter were wholly of first impression, I would not be inclined to agree with him; and, certainly, no one would justly criticize our higher courts if they should adopt Mr. Justice Lehman's view, and make it the basis of the rule of conduct it leads to. We shall permit an appeal, if the defeated party should so desire. In law, the most important of all things is that there be established rules that are well understood. I am holding as I do for the reason that while at present there is very little law upon the subject, I am of the opinion that such authority as I have been able to find seems to force the conclusion that when the defendants undertook to redeliver the bond they acted as greatly at their peril as if they had been voluntary bailees.

For the reasons stated, I vote to affirm.

Judgment affirmed, with twenty-five dollars costs, with leave to defendants to appeal to the Appellate Division.

Burr, J. (concurring). I concur in the conclusion reached by Mr. Justice Mullan and vote to affirm. I believe that defendants having received the bond and taken it into their possession became liable even as gratuitous or involuntary bailees for its proper re-delivery to the true owner.

Lehman, J. (dissenting). I agree in all material particulars with the statement of facts contained in

the opinion of Mr. Justice Mullan. In effect the record shows that through an innocent mistake the plaintiffs delivered by messenger at defendants' office, through the slot in a window intended for the delivery of securities purchased by the defendants, a bond which the defendants had not purchased and that the defendants promptly discovered the mistake and endeavored to return the bond to the plaintiffs' messenger but, by innocent mistake on their part, actually handed the bond to a stranger instead of the plaintiffs' messenger.

Thereafter the plaintiffs made a formal demand upon the defendants for the return of the bond, but at that time the bond was of course no longer in their possession and they could not comply with the demand. The plaintiffs thereupon brought this action alleging in the complaint that on June tenth they were under contract to deliver to the defendants a $1,000 bond of the Oregon Short Line Railroad Company and that they delivered to the defendants a " certain bond " which they believed to be a bond of the Oregon Short Line Railroad for the purpose of complying with their contract. That subsequently they were informed that the bond was a $1,000 bond of the Oregon and California Railroad Company, and the defendants refused to accept said bond as a compliance with their contract for a bond of the Oregon Short Line Railroad. That, " by reason of the premises the plaintiffs are entitled to the return of the said bond of the Oregon and California Railroad Company and have duly demanded the same from the defendants but defendants have wrongfully neglected and refused to deliver same to plaintiffs."

It is unnecessary now to consider whether the complaint sufficiently sets forth any cause of action, for no motion was made by the defendants to dismiss the

Appellate Term, First Department, January, 1922. [Vol. 117.

complaint on the ground of insufficiency and no such point is raised on this appeal. It is to be noted, however, that the complaint does not allege any negligence on the part of the defendants and I agree with Mr. Justice Mullan that no such issue was litigated and that the judgment can be sustained only if, as a matter of law, the defendants' mistake in returning the bond to the wrong messenger constituted a conversion of the bond or at least a breach of an implied agreement on their part to return the bond only to the plaintiffs.

While the slot in the window constituted an invitation to deliver at that place securities intended for the defendants, it is evident that it constituted an invitation only to deliver securities which the defendants were under some obligation to receive. Obviously no person could by slipping in other securities impose upon the defendants without their consent any affirmative obligation to care for these securities, to pay for them or even to receive them. The plaintiffs never intended to deliver to the defendants an Oregon and California Railroad bond. By their mistake the plaintiffs divested themselves of possession of the bond, but they did not transfer to the defendants either title or right to possession if they demanded the return of the bond. The defendants had not consented to accept the bond as a deposit; they claimed no title to it and they were not subject to any trust or obligation as bailees, for a bailment arises only through an express or implied contract. They were put in possession of the bond without any agreement on their part, express or implied, to accept the deposit of the bond; and though persons who come into possession of the property of others without their consent are sometimes for convenience called "involuntary" or "quasi-bailees," they incur no responsibility to the true owner in respect thereof. It is only where they com-

mit some " overt act " of interference with the prop-
erty that an implied contract of bailment is created.
1 Halsbury's Laws of England, § 1078.

It can hardly be contended, however, that every
" overt act " of interference with the property creates
an implied obligation of bailment. Undoubtedly an
" involuntary bailee " need not abandon the property,
but he may, without incurring further liability, at
least take steps to preserve and care for the property.
As stated by Mr. Justice Mullan it is only in case the
involuntary bailee shall exercise *any dominion* over
the thing so bailed that he becomes as responsible as
if he were a voluntary bailee. The exercise of domin-
ion, as I understand it, necessarily involves some act
inconsistent with the complete right of dominion of
the real owner, at least to the extent that it would be
wrongful unless performed by some person to whom
the owner had transferred the right to possession. In
other words, an implied contract of bailment with its
consequent obligations arises only where a person in
possession of the property of another does some act
which is inconsistent with the view that he does not
*accept* the possession which has been thrust upon him.

The " overt act " which it is claimed constituted an
improper interference with or act of dominion over
the plaintiffs' property consists of a delivery of the
bond to a stranger who had no title to it. If the
defendants had attempted to transfer to this stranger
any title or right of possession of their own, then of
course they could not claim that they had never ac-
cepted possession of the bond as bailees. They would
then be on the horns of a dilemma, for they would
have either denied the right of the true owner and
thereby converted the property to their own use or
would have exercised a right which was theirs only if
they accepted the deposit of the bond left with them.

In the case of *Hiort* v. *Bott*, L. R. 9 Exch. 86, relied on for authority by Mr. Justice Mullan, the defendant had in fact attempted to transfer to a stranger his own ostensible title to the goods and he had no actual title unless he first accepted an attempted delivery of the goods by the true owner to himself. The defendant in that case had not received the barley into his possession but had received merely a delivery order which made the barley deliverable " to the order of consignor or consignee " and as pointed out by Bramwell, B., " if the defendant had done nothing at all it would have been delivered to the plaintiffs." In the language of Cleasby, B., " He had no duty to perform in relation to the goods, and was a mere stranger, except that by mistake he had been made consignee, and so had an ostensible title, and could dispose of the goods." Knowing that the ostensible title was vested in him only by mistake the defendant was induced by fraud to indorse the delivery order and thereby transfer to a third party the ostensible title to the barley.

The defendant could not indorse the delivery order unless he had title to the barley either in his own right or as agent for the true owner. He did not claim title in his own right, and if he had done so knowing that the ostensible title had been transferred to him only by mistake, such act would in itself have constituted a conversion. His act was lawful, therefore, only if he had accepted title as an agent. The fraud of the alleged broker induced him to believe that he had authority as agent of the true owner to transfer title, but he voluntarily assumed to act as agent of the owner and to accept title as such agent. By voluntarily doing an act which would be lawful only if he accepted title either in his own right or as agent of the owner, he was not in a position to say that possession of the property was thrust on him without his

consent.  He did in fact accept the title as agent of the owner and he then was bound to transfer the title only in accordance with authority actually given by the owner, and no mistake however innocent can avail an agent as an excuse for any other delivery.

It seems to me quite clear that this was the real ground of the decision in the case of *Hiort* v. *Bott, supra,* and the facts in the case before us are so clearly distinguishable that it can in no wise be regarded as an authority for the contention of these plaintiffs, and in fact the reasoning of the opinions rendered in that case supports the contention of the defendants herein.  In the present case the defendants were put in possession of the bond by mistake; they discovered the mistake promptly and thereafter they committed no " overt act " of interference with the bond except that they attempted to divest themselves of this posses- sion by delivering the bond to a person whom they believed to be the messenger of the plaintiffs.  That act was not only consistent with the continued title and right of dominion in the plaintiffs but was an honest attempt to restore possession to the true own- ers.  It certainly cannot be contended that the defend- ants were bound at their peril to wait until the plain- tiffs came to their office and physically took away their property; they could take proper steps to divest them- selves of the possession thrust upon them by mistake without thereby impliedly agreeing, contrary to their clear intention, to accept possession as bailees with the consequent obligations flowing from such relation. It is quite immaterial whether we call these defend- ants bailees or not if we keep in mind the fact that the possession of these goods was thrust upon them by mistake of the plaintiffs and without their invitation or consent, and that, therefore, any liability for failure to return the goods to the true owner upon demand

Appellate Term, First Department, January, 1922. · [Vol. 117.

must be the result of some act voluntarily done by the defendants thereafter. An attempt to return the bond to the true owner or to the person who delivered it cannot be considered as inconsistent with a recognition of the complete ownership and right of dominion by the true owner and certainly shows no intent to accept the possession thrust upon the defendants by plaintiffs' mistake and I fail to see how, in the absence of such elements, any implied contract of bailment can arise. If in making an attempt to return the goods, which was lawful and proper in itself, the defendants used means which were not reasonable and proper and as a result thereof the goods were lost or misdelivered, then the defendants would be liable for negligence or possibly for conversion, for every man is responsible for his own acts; but if the defendants had a right to divest themselves of possession and attempt to return the goods, then in the absence of some obligation resting upon contract to deliver the goods only to the true owner or upon his order, I do not see how the mere fact that through innocent mistake the defendants handed the bond to the wrong messenger could constitute a conversion. The defendants could not properly disregard entirely the mistake in the delivery of the bonds. Common courtesy and prudence if not the law, certainly placed upon them the duty to take some steps by which the plaintiffs would be apprised of their mistake and enabled to regain their property. The defendants might have placed the bond in a safe and telephoned to the plaintiffs to call for the bond, but they were under the impression that the messenger who delivered the bond was still present and they gave the bond to him as a means of carrying out their evident duty to apprise the plaintiffs of their error and revest possession in them. The first course might have been the more prudent but as stated by

Cleasby, B., in his opinion in *Hiort* v. *Bott, supra,* " In such cases " (*i. e.,* in cases where a so-called involuntary bailee has received property into his possession for a purpose which cannot, as afterwards appears, be exactly carried into effect) " the bailee has a duty to perform in relation to the goods, and he is placed in a difficulty in the discharge of that duty by the default of the plaintiff, who ought not to be allowed to complain if, under that difficulty, the bailee has acted in a manner which is considered reasonable and proper."

I have examined the other cases cited in the briefs or in Mr. Justice Mullan's opinion but I have found no case which is in any way inconsistent with these views. It would serve no purpose to analyze them separately for in every case it very clearly appears that where a party has been held liable for failure to return goods to the true owner on demand one of the following elements appeared: 1, the defendant had accepted the deposit of the goods and was therefore under a contractual obligation to return them on demand; or 2, the goods were still in the possession of the defendant when the demand was made; or 3, the defendant had done some voluntary act consistent only with the view that he claimed some property in the goods either as owner or agent of the owner. In all such cases, upon well established principles, the person in possession of the goods is bound to return the goods to the true owner on demand and a previous delivery to a third person even by innocent mistake cannot constitute any excuse or defense for a failure to comply with his obligation. Liability in law must in all cases be founded either on contract or on some wrongful act. The defendants in this case promptly evinced their intention not to accept the possession of the bond thrust upon them by mistake; they merely attempted to divest themselves of this possession, and certainly

Appellate Term, First Department, January, 1922. [Vol. 117.

from such attempt no agreement to accept this possession can be implied. Until that time the defendants were under no obligation either to accept the bond as bailees or return it upon demand to the true owners unless at the time of the demand the bond was still in their possession; and it seems to me anomalous and illogical to say that an absolute obligation to return the bond to the plaintiffs and not to deliver it to any other person arises merely from the fact that the defendants did by mistake and through an honest disclaimer of any title or right of possession in the bond, physically deliver it to another. They claimed no title and no right to possession in the bond; they attempted to transfer no title or right of possession of their own in the bond; they had physical possession of the bond through plaintiffs' mistake and they transferred nothing but this physical possession. The plaintiffs could not compel them to retain physical possession, and their act of transferring physical possession even to a stranger under these circumstances shows no exercise of any dominion over the property, for it constitutes no denial of the complete and sole right of dominion in the plaintiffs. In my opinion plaintiffs have, therefore, no right of action against the defendants unless the means which the defendants used to rid themselves of their possession were not reasonable and proper.

While no case has been cited which is exactly parallel to the present case, it seems to me that in several cases in the courts of this state these considerations have been assumed, even if not expressly stated. The case of *Cohen* v. *Koster,* 133 App. Div. 570, is very easily distinguishable from the present case, but there was in that case a delivery of plaintiff's goods in defendant's possession, by the defendant to a thief and both the prevailing and the dissenting opinion

seem to me to assume that if the defendant had not knowingly accepted possession of these goods under an implied contract of bailment, he was not liable. The case of *Krumsky* v. *Loeser*, 37 Misc. Rep. 504, seems to me more directly in point and I think the decision is necessarily based upon the same view of the law of bailments as I have taken. I cannot see that there is any possible distinction in principle in regard to the obligations arising from possession which has been thrust upon the defendant either by fraud practiced on the true owner or by mistake of the true owner. While that case may perhaps logically be distinguished from the present case in that there the defendant did not know the true owner and was induced to *give up possession* of the goods to a thief through fraud, yet in my opinion these circumstances do not logically affect the rule that a person in possession of goods without his consent is not liable for conversion merely because he delivers them to a stranger in an attempt to revest possession in the true owner, though they may affect the question of the defendant's negligence and whether he has acted reasonably and properly, but only these questions. I do not think that it is worth while to discuss the case of *Morris* v. *Third Avenue R. R. Co.*, 1 Daly, 202. Regardless of whether it was decided correctly or not upon its peculiar facts, it certainly assumes that where possession of goods is thrust upon a so-called bailee without his consent, the " bailee " is not liable for a delivery to a stranger made without negligence and with intent to deliver to the true owner. I cannot see that except in regard to the question of negligence there is any logical distinction in regard to the effect of delivery to a stranger, where the owner is known and where he is not known. In each case the holder has assumed to revest possession in the true owner

Appellate Term, First Department, January, 1922. [Vol. 117.

and by mistake has delivered it to a stranger, and in neither case has he assumed any right of his own to dispose of the goods, and thereby exercised dominion over them; but in both cases the question still always remains whether the holder in so acting was free from negligence.

Even if under these pleadings we could consider the question of negligence, I find no evidence upon this question to sustain a judgment in favor of the plaintiffs. There is no doubt that the defendants acted in good faith and in the honest belief that they were handing back the bond to the messenger who delivered it. They had assumed no obligation of any kind to the plaintiffs; any act they performed was for the plaintiffs' benefit and it was through plaintiffs' mistake that they were called upon to act at all in the premises. Doubtless if they had foreseen the possibility of mistake they would not have delivered the bond to the wrong messenger; but it was not unreasonable to suppose that the messenger might be waiting or that if he had left, no thief would be in the office who would claim to represent the plaintiffs. They probably committed an error of judgment but for such error they cannot be held liable. Since they owed no obligation to the plaintiffs and acted in good faith under the reasonable belief that they were returning the bond to the messenger who delivered it, I see no ground for imposing upon them liability for the loss of a bond which would never have been lost but for the plaintiffs' mistake, due apparently to the plaintiffs' negligence.

The contention of the plaintiffs that under sections 129 and 131 of the Personal Property Law the defendants are liable for the price of the Oregon Short Line Railroad Company bond which they had agreed to purchase from the plaintiffs because they failed to return

to the plaintiffs the Oregon and California Railroad Company bond delivered in attempted compliance with the contract between the parties seems to require no detailed consideration. Even if the Personal Property Law applies to the sale of a bond, these sections would not be applicable to the facts in this case for the evidence shows that the plaintiffs delivered the bond by mistake and without any intent to pass title to the bond in compliance with their contract and that the defendants did not " retain " the bond but, on the contrary, promptly divested themselves of its possession.

For these reasons it seems to me that the judgment should be reversed, with costs, and the complaint dismissed, with costs.

Judgment affirmed, with twenty-five dollars costs, with leave to defendants to appeal to the Appellate Division.